**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID ANTHONY RUNYON,

*Defendant-Appellant.*

No. 09-11

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Rebecca Beach Smith, District Judge.
(4:08-cr-00016-RBS-TEM-3)

Argued: December 5, 2012

Decided: February 25, 2013

Before WILKINSON, NIEMEYER, and GREGORY,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Judge Gregory joined.
Judge Niemeyer wrote a concurring opinion.

**COUNSEL**

**ARGUED:** Seth C. Farber, WINSTON & STRAWN, LLP, New York, New York, for Appellant. Brian James Samuels, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee. **ON BRIEF:** Teresa L. Norris, BLUME WEYBLE & NORRIS, LLP, Columbia, South Carolina, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Lisa R. McKeel, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Defendant David Anthony Runyon appeals his conviction and capital sentence for conspiracy to commit murder-for-hire, among other charges stemming from the same course of events. For the following reasons, we affirm.

I.

A.

On April 30, 2007, Cory Allen Voss, an officer in the United States Navy, was found dead of multiple gunshot wounds in his pickup truck in a parking lot in Newport News, Virginia. Three individuals were arrested in connection with the killing: Runyon; Catherina Voss ("Cat"), the victim's wife; and Michael Draven. On February 13, 2008, a federal grand jury in the Eastern District of Virginia returned a five-count indictment charging all three with the following crimes:

- Count One: conspiracy to commit murder-for-hire, in violation of 18 U.S.C. § 1958(a);

- Count Two: carjacking resulting in death, in violation of 18 U.S.C. § 2119 and 18 U.S.C. § 2;

- Count Three: bank robbery resulting in death, in violation of 18 U.S.C. § 2113(a) and (e) and 18 U.S.C. § 2;

- Count Four: conspiracy to commit robbery affecting commerce, in violation of 18 U.S.C. § 1951(a); and

- Count Five: murder with a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) and (j) and 18 U.S.C. § 2.

The indictment also included the requisite notice of special findings for seeking capital punishment pursuant to the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3598, which governs multiple aspects of this case. The government further notified Runyon that it intended to seek the death penalty against him on July 17, 2008.

Cat pleaded guilty to all counts and was sentenced to life imprisonment. Runyon and Draven were jointly tried before a jury beginning on June 30, 2009. At the end of the prosecution's case on the question of guilt, the court granted the defendants' motion to dismiss Count Three. The jury found both defendants guilty of Counts One, Two, and Five and not guilty of Count Four. The government did not pursue the death penalty against Draven. He received a sentence of life imprisonment, and this court affirmed his convictions in *United States v. Draven*, 417 F. App'x 362 (4th Cir. 2011) (per curiam).

The district court conducted a death penalty eligibility hearing for Runyon on July 22, 2009. The previous day, the court had excused a juror whose mother had died the night before and replaced her with an alternate, and the court informed the

parties of this substitution immediately before the eligibility hearing. Neither side presented additional evidence at the hearing, and on that same day, the jury found Runyon eligible to receive the death penalty as a threshold matter. The penalty selection phase commenced on August 19, 2009. The jury began deliberating during the afternoon of August 26, 2009. The next morning, the court excused a juror whose brother-in-law had passed away the night before, replacing her with an alternate. The jury returned its verdict that evening, recommending a sentence of death on Counts One and Five and a sentence of life imprisonment on Count Two. The court imposed the recommended sentences on December 4, 2009, and this appeal followed.

### B.

The evidence adduced during the guilt phase of Runyon's trial established the following factual foundations for his convictions.

Cat and Draven began conducting an extramarital affair during the summer of 2006. The affair commenced when Voss, to whom Cat had been wed since 1999, was deployed aboard the USS Elrod. Cat and Draven hired Runyon, whom Draven met while participating in a drug study in February 2007, to murder Voss in hopes of gaining his Navy death benefits and life insurance proceeds.

On April 20, 2007, Cat opened an account at a branch of the Langley Federal Credit Union in Newport News ("the LFCU") with a five dollar deposit. Shortly before midnight on April 29, 2007, Cat sent Voss to the automated teller machine ("ATM") at the LFCU to withdraw cash. Video surveillance showed that while Voss stood at the ATM, an unidentifiable intruder entered his pickup truck. Voss drove away from the ATM but returned a few minutes later and attempted another withdrawal, which was denied due to insufficient funds. Voss was found dead in his truck in a parking lot near the LFCU

the next morning. He had been shot five times at close range. Four hollow-point bullets from a ".38 class" gun—which includes firearms capable of firing .357 magnum, .38 special, and 9 mm cartridges—were recovered from his body. The cause of death was three shots to the chest and abdomen.

The prosecution presented a wealth of evidence proving that Runyon acted as the triggerman in a murder-for-hire conspiracy. The government established that on the day of the killing, Runyon purchased a .357 magnum handgun and ammunition in West Virginia, where he lived, and that a friend of his pawned the gun several months later. In the console of Runyon's vehicle, law enforcement located a map of Newport News with notes referring to Voss, Voss's vehicle, and the LFCU, as well as a photograph of Cat and Draven with their names, addresses, and a social security number written on the back. In Runyon's current and former homes, investigators discovered phone numbers for Cat and Draven; a box of .357 magnum bullets with five missing; papers mentioning the LFCU and the travel time to Virginia; and a list of items including a taser, Spyderco knife, tarp, and trash bag, as well as boots, gloves, a black hoodie sweatshirt, and military-style pants. Moreover, a variety of telephone and email evidence showed that Cat, Draven, and Runyon had arranged the contract killing and attempted to orchestrate a cover-up. For example, while Runyon apparently asked for five hundred dollars up front, a Western Union money order showed that he received two hundred and seventy-five dollars from Draven's brother on June 1, 2007. Finally, several witnesses testified that Runyon had boasted about killing Voss—or a military member or unidentified individual—for money.

As mentioned above, at the close of the prosecution's case-in-chief, the court dismissed the bank robbery charge (Count Three). The jury ultimately convicted Runyon of conspiracy to commit murder-for-hire (Count One), carjacking resulting in death (Count Two), and murder with a firearm in relation to a crime of violence (Count Five) and found him not guilty

of conspiracy to commit robbery affecting commerce (Count Four).

## C.

The sentencing portion of the trial began with the eligibility phase, which determines whether a defendant meets the minimum statutory requirements for receiving the death penalty. Pursuant to the FDPA, a defendant convicted of certain crimes—including those charged in Counts One, Two, and Five here—can be declared eligible if the jury determines, unanimously and beyond a reasonable doubt, that one of four enumerated intent elements and at least one statutory aggravating factor are present. *See* 18 U.S.C. §§ 3591-3593. Here, the jury found that Runyon had intentionally killed Voss, *see id.* § 3591(a)(2)(A), and that the prosecution had established two statutory aggravating factors: first, that Runyon "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value" and, second, that he "committed the offense after substantial planning and premeditation to cause the death of a person," *id.* § 3592(c)(8), (9).

The district court then proceeded to the penalty selection phase. Pursuant to the FDPA, the jury must decide by unanimous vote "whether the defendant should be sentenced to death, to life imprisonment without the possibility of release or some other lesser sentence." *Id.* § 3593(e). In deciding whether to recommend capital punishment, the jury must determine "whether all the aggravating . . . factors found to exist sufficiently outweigh all the mitigating . . . factors found to exist to justify a sentence of death." *Id.* The FDPA enumerates a number of statutory aggravating factors and mitigating factors (which are also often called "aggravators" and "mitigators") and allows the parties to propose nonstatutory factors for the jury to consider as well. *Id.* § 3592(a), (c); *id.* § 3593(a). While the jury may find only aggravators for which the prosecution has provided notice as defined by the

statute, the jury may find additional mitigators beyond those specifically proposed by the defense. *Id.* § 3592(a), (c); *id.* § 3593(a). Finally, the FDPA provides that, while findings concerning aggravating factors must be unanimous, findings concerning mitigating factors "may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established." *Id.* at § 3593(d).

After receiving an abundance of evidence over several days (from sixteen prosecution and twenty-one defense witnesses),[1] the jury unanimously found that the prosecution had proved each of its proposed nonstatutory aggravators, in addition to the two statutory aggravators already found during the eligibility phase. As listed on the special verdict form, these were:

- Nonstatutory Aggravating Factor One: Runyon "caused injury, harm, and loss to the victim, Cory Allen Voss, and the victim's family and friends";

- Nonstatutory Aggravating Factor Two: In killing Voss, Runyon "utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army";

- Nonstatutory Aggravating Factor Three: Runyon "engaged in acts of physical abuse toward women"; and

- Nonstatutory Aggravating Factor Four: Runyon

---

[1]It bears note that the FDPA speaks in terms of "information" rather than "evidence" and expressly provides that the rules of evidence do not generally apply to capital sentencing proceedings. *See id.* § 3593(c). Where it is natural to do so, we use the word "evidence" here colloquially.

> "has demonstrated a lack of remorse for murder-
> ing Cory Allen Voss as demonstrated by the evi-
> dence in the case."

The jury also unanimously found that Runyon had estab-
lished seven of the fourteen mitigators proposed by the
defense:

- Statutory Mitigating Factor One: Runyon "does
  not have a serious criminal record," *see id.*
  § 3592(a)(5);

- Statutory Mitigating Factor Two: "Other persons
  equally culpable in the crime will not be pun-
  ished by death," *see id.* § 3592(a)(4);

- Nonstatutory Mitigating Factor One: Runyon
  "will serve a sentence of life in prison without the
  possibility of release if not sentenced to death";

- Nonstatutory Mitigating Factor Nine: Runyon's
  son "will suffer emotional harm if his father is
  executed";

- Nonstatutory Mitigating Factor Ten: Runyon's
  mother "will suffer emotional harm if her son is
  executed";

-  Nonstatutory Mitigating Factor Eleven: Runyon
  "served his country as a member of the United
  States Army and was honorably discharged"; and

- Nonstatutory Mitigating Factor Twelve: Runyon
  "graduated from high school and earned an asso-
  ciate of arts degree . . . and took further college
  courses to expand his education."

Additionally, the jury unanimously found two further nonsta-
tutory mitigating factors that the defense had not expressly

proposed: first, that Runyon "continued to witness and experience domestic violence and parental conflict/abuse from [his] mother and adoptive father" and, second, that Runyon's brother "will suffer emotional harm if his brother is executed."

Finally, beyond these unanimous findings, ten or eleven of the twelve jurors found the following three proposed mitigators:

- Nonstatutory Mitigating Factor Two: Runyon "has worked and has been legally employed for all of his life";

- Nonstatutory Mitigating Factor Three: Runyon "committed acts of kindness and generosity for his neighbors and his community"; and

- Nonstatutory Mitigating Factor Four: Runyon "grew up, witnessed, and experienced, domestic violence and parental conflict until his mother and biological father separated."

And eleven jurors agreed that the defense had established an additional mitigating factor that it had not specifically proposed: that Runyon "was given the impression that Cory Voss was molesting [Voss's] daughter."

The special verdict form concluded by confirming that upon weighing the six aggravating factors (two from the eligibility phase and four from the penalty selection phase) and multiple mitigating factors, the jury unanimously recommended a sentence of death on Counts One and Five and a sentence of life imprisonment without the possibility of release on Count Two.

## II.

Runyon appeals both his convictions and his sentences on various grounds. Although the bulk of Runyon's appeal

focuses on the latter, we take up his conviction-related challenges first in the interest of chronological order. First, Runyon claims that the statutes on which Counts One and Two are premised are unconstitutional. Second, he contends that there was insufficient evidence to establish the jurisdictional element of Count One. We address these arguments in turn and, for the reasons that follow, find each unconvincing.

### A.

Runyon asserts that both the federal murder-for-hire statute, 18 U.S.C. § 1958, which underlies Count One, and the federal carjacking statute, 18 U.S.C. § 2119, which underlies Count Two, are unconstitutional because their enactment exceeded Congress's enumerated powers—in particular, the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3.

### 1.

The text of the murder-for-hire statute provides for punishment of whoever

> travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so.

18 U.S.C. § 1958(a). While Runyon does not appear to challenge the statute's constitutionality to the extent that it addresses "travel in interstate or foreign commerce," he takes issue with the fact that it also purports to reach the mere "use

[of] any facility of interstate or foreign commerce" to perpetrate contract killings. In particular, Runyon argues that a 2004 amendment changing the phrase "facility in interstate or foreign commerce" to "facility of interstate or foreign commerce" broadened the statute's scope to such a degree as to cover virtually every murder-for-hire—including, for instance, a contract killing in which all of the parties were neighbors and the defendant made a single phone call to the victim's residence.

This argument fails by a wide margin. Pursuant to its commerce power, Congress may, among other things, "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *United States v. Lopez*, 514 U.S. 549, 558 (1995). We agree with all of the circuits to address the question that the amended murder-for-hire statute meets this standard, as there exists "no meaningful distinction between the terms 'facilities' and 'instrumentalities' of interstate commerce." *United States v. Marek*, 238 F.3d 310, 317 & n.26 (5th Cir. 2001); *see also, e.g.*, *United States v. Mandel*, 647 F.3d 710, 720-23 (7th Cir. 2011); *United States v. Schaefer*, 501 F.3d 1197, 1205 (10th Cir. 2007) (listing "any facility of interstate . . . commerce" language from § 1958(a) as an example of an "expansive exercise of [Congress's] Commerce Clause powers"), *overruled on other grounds by United States v. Sturm*, 672 F.3d 891, 901 (10th Cir. 2012). Congress's enactment of the murder-for-hire statute, therefore, did not exceed its authority under the Commerce Clause.

2.

Runyon's constitutional attack on the federal carjacking statute meets the same fate. That statute criminalizes "tak[ing] a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation,

or attempt[ing] to do so," where the perpetrator possesses "the intent to cause death or serious bodily harm." 18 U.S.C. § 2119.

Runyon's challenge cannot overcome *United States v. Cobb*, which expressly rejected a Commerce Clause challenge to the same statute. 144 F.3d 319 (4th Cir. 1998). First, we found that the carjacking statute's inclusion of an "express jurisdictional element" tying the covered cars to interstate or foreign commerce "'satisfies the minimal nexus'" required by recent Supreme Court precedent. *Id.* at 321-22 (quoting *United States v. Wells*, 98 F.3d 808, 811 (4th Cir. 1996)). Second, and independently, we found that the carjacking statute "is also a valid exercise of Congress's power to regulate an instrumentality of interstate commerce—cars," citing the same language from *Lopez* on which we rely above and noting that multiple other circuits had come to the same conclusion. *Id.* at 322. The arguments pressed by Runyon, therefore, are both foreclosed by *Cobb* and unpersuasive on the merits. Because we also find that the prosecution's evidence provided firm support for Runyon's conviction on Count Two, that conviction stands.

## B.

Next, Runyon argues that even if the federal murder-for-hire statute underlying Count One survives his constitutional challenge, there was insufficient evidence here to satisfy its jurisdictional hook. As indicated above, the murder-for-hire statute requires that the defendant, while possessing the requisite intent, (1) "travel[ed] in or cause[d] another (including the intended victim) to travel in interstate or foreign commerce" or (2) "use[d] or cause[d] another (including the intended victim) to use the mail or any facility of interstate or foreign commerce." 18 U.S.C. § 1958(a). Here, the government argues that evidence establishing that Runyon drove his own truck from West Virginia to Virginia on the day of the murder sufficiently satisfied the first hook, on which the jury was

instructed. Runyon contends, to the contrary, that travel "in interstate commerce" requires transport by commercial means (such as by bus, train, or plane). This is so, he argues, because if all travel between two or more states qualifies, the word "commerce" becomes entirely superfluous.

Runyon's argument, however, fails under *United States v. Lentz*, in which this court found that travel from one state to another in a personal vehicle constituted "transport[ ] in interstate or foreign commerce" under the federal kidnapping statute, 18 U.S.C. § 1201(a)(1). 383 F.3d 191, 196-97, 199-200 (4th Cir. 2004). The text of the jurisdictional element at issue here is, of course, essentially identical to that considered in *Lentz*, and we therefore decline to interpret it differently.

With the pertinent scope of the jurisdictional hook thus established, we turn to whether "substantial evidence" supported that element here. In answering that question,

> the appellate function is not to determine whether the reviewing court is convinced of guilt beyond reasonable doubt, but, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, "whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt."

*United States v. Burgos*, 94 F.3d 849, 862-63 (4th Cir. 1996) (en banc) (quoting *United States v. Powell*, 469 U.S. 57, 67 (1984)). Runyon cannot clear this high hurdle, as the prosecution presented evidence from which the jury could readily infer that he drove his truck across state lines in order to kill Voss. Such evidence included the fact that investigators found in that very truck the map of Newport News and the photograph of Cat and Draven, both of which contained inculpatory notes, along with the fact that Runyon made a withdrawal from an ATM in West Virginia during the early afternoon hours of the day Voss was shot. The prosecution, therefore,

sufficiently established the jurisdictional element of the murder-for-hire statute, and we accordingly affirm Runyon's conviction on Count One.[2]

## III.

With the remainder of his arguments, Runyon shifts from contesting his convictions for killing Voss to contesting the jury's sentencing recommendations on those convictions. Specifically, he challenges the nonstatutory aggravating factors charged by the prosecution and found by the jury, various evidence introduced by the prosecution to prove these factors, comments made by the prosecution during the closing arguments to the penalty selection phase of the trial, the district court's substitution of jurors at points following the guilt phase, and the district court's instructions to the jury at the end of the sentencing proceeding.

Before considering the merits of these arguments, it is worth noting a few formidable obstacles that they must overcome. First, many of Runyon's nonconstitutional challenges concern rulings by the district court that we review under the deferential abuse-of-discretion standard. *See, e.g.*, *Noel v. Artson*, 641 F.3d 580, 591 (4th Cir. 2011) (evidentiary rulings); *United States v. Novak*, 607 F.3d 968, 972 (4th Cir. 2010) (jury instructions); *United States v. Ollivierre*, 378 F.3d 412, 417 (4th Cir. 2004) (comments during closing arguments), *vacated on other grounds by Ollivierre v. United States*, 543 U.S. 1112 (2005). We are generally reluctant to reverse such discretionary rulings because district courts enjoy the considerable advantage of having perceived firsthand the witnesses

---

[2]We likewise reject Runyon's challenge to his conviction on Count Five for using and carrying a firearm "in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States." 18 U.S.C. § 924(c)(1)(A). Runyon's argument that no predicate offense survives necessarily fails in light of our affirming his convictions on Counts One and Two.

who testified, the evidence that was introduced, and the arguments that were made at the proceeding under review. While we by no means abdicate our duty to carefully consider Runyon's claims, we discharge this duty mindful of the risks of overstepping our limited role and impinging on trial courts' essential trial-management functions.

Second, in impugning multiple aspects of his sentencing proceeding, Runyon seems to overlook the fact that sentencing, including capital sentencing, is a wide-ranging process that accords considerable discretion to the sentencer—here, the jury. As the Supreme Court has held:

> "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) (citation omitted) (quoting *California v. Ramos*, 463 U.S. 992, 1008 (1983); *Zant v. Stephens*, 462 U.S. 862, 875 (1983)). The FDPA reflects this broad conception of capital sentencing, permitting the jury to consider not only a number of expressly enumerated aggravating factors, but "any other aggravating factor for which notice has been given." 18 U.S.C. § 3592(c). It also allows the parties to present aggravating or mitigating evidence "as to any matter relevant to the sentence . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials." *Id.* § 3593(c). Whereas Runyon may wish to severely cabin the jury's sentencing discretion by restricting the evidence it may hear and the inferences it may draw, the FDPA anticipates that the jury will confront a broad

array of information and enjoy considerable leeway in assessing it.

Third, as envisioned by the FDPA, capital sentencing proceedings are not only wide-ranging; they are in important respects even-handed. Just as the defendant may introduce evidence on myriad mitigating factors, so the prosecution may try to prove an equally varied range of aggravating factors. *Id.* § 3592(a), (c). Runyon, by contrast, seems to contemplate a more one-sided affair, with the defendant making his mitigation case more or less unfettered and the prosecution responding with but a narrow subset of the available aggravating evidence. Though we must uphold for capital defendants the procedural safeguards guaranteed them by the Constitution and the FDPA, we must also avoid constraining unduly the prosecution's ability to paint a complete picture of the defendant's crime and character, lest the jury be less than fully and amply informed.

With these caveats in mind, we now turn to Runyon's specific challenges.

IV.

Runyon first challenges the nonstatutory aggravating factors submitted to the jury and the prosecution's efforts to prove them. Specifically, pursuant to the FDPA, 18 U.S.C. § 3592(c), the prosecution gave notice of four nonstatutory aggravating factors for the jury to consider: (1) lack of remorse; (2) injury and loss to Voss and his family and friends ("victim impact"); (3) use of law enforcement and military training to perpetrate the murder; and (4) history of physical abuse toward women. Runyon objected on various grounds to each of these factors, as well as to some of the evidence and arguments the prosecution presented to establish them. The district court overruled his objections, and the jury heard evidence on all four, ultimately finding all of them to exist. We consider each factor in turn.

## A.

We first address Runyon's arguments on the lack-of-remorse aggravator. While Runyon does not challenge on appeal the propriety of the prosecution proposing this aggravator, he contends that the court's decision to admit a particular piece of evidence in support of this factor (and in rebuttal to a mitigator proposed by the defense) violated the Constitution and the FDPA. That evidence was a videotaped depiction of Runyon being interrogated on December 11, 2007, as the investigation came closer to uncovering his role in the crime.

The video runs just over forty-two minutes. It shows three law enforcement officers, led by Detective Larry Rilee of the Newport News Police Department, questioning Runyon intensively about his role in Voss's death. The interrogation begins with Rilee reading Runyon his *Miranda* rights, which Runyon confirms understanding. Runyon makes a handful of inculpatory statements—including admitting that he knew Draven somewhat, had spoken with Cat by phone, owned the map with notes about Voss, and had been in possession of both the photo of Cat and Draven and certain firearms. Nevertheless, he sits silently for the vast majority of the exchange, seldom providing answers longer than one or two words, and he never expressly admits any involvement in the murder. At one point, the officers leave the room, apparently to give Runyon time to consider whether he wants to cooperate with the investigation. (While the time stamp indicates that Runyon remained alone for approximately twelve minutes, the video omits this period.) Throughout the interrogation, Runyon's demeanor is basically attentive; his tone is generally calm; and his face is largely expressionless. The conversation ends when Runyon makes clear that he wishes to consult with counsel.

The video was played before the jury and subsequently admitted into evidence during the portion of the penalty selection phase in which the prosecution had the opportunity to

rebut mitigation evidence presented by the defense. Specifically, the prosecution proposed to use the video to rebut evidence on the statutory mitigator that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C. § 3592(a)(4). On this factor, the defense had introduced Cat's plea agreement and the accompanying statement of facts. In response, the prosecution sought to have Rilee testify about Cat's and Draven's post-arrest confessions, contrasted with the video and Rilee's recollections of Runyon's December 11, 2007, interrogation. Defense counsel objected orally, arguing that the video did not properly rebut any defense evidence. The district court overruled the objection. As for the equally-culpable mitigator, the court held that the prosecution was entitled to explain why the government had not pursued the death penalty against Runyon's co-conspirators. Moreover, the court expressed an expectation that the video would also provide evidence supporting the lack-of-remorse aggravator.

1.

On appeal, Runyon renews his objection to this piece of evidence on multiple grounds—some constitutional, some statutory. We first address Runyon's contention that several statements made by the interrogating officers in the video contaminated the sentencing proceeding with invidious considerations concerning his ethnicity and religion.

Toward the beginning of the exchange, Detective Rilee asked Runyon: "[Y]ou're Asian, right, Asian-American? You're an honorable Asian man, aren't you?" "Yes sir," he answered. Imploring Runyon to be honest, Rilee continued, "You know, if you're an honorable Asian man and your integrity is intact and you have any respect for anybody at all, then you'll do the right thing today, okay?" The officers proceeded to invoke Runyon's "honor" on multiple occasions during the interrogation.

Later, Rilee asked Runyon whether he had any "religious beliefs," to which Runyon replied that he is a Christian. Rilee continued:

> You believe in forgiveness then; you can be forgiven for whatever the sin might be. Obviously in the Ten Commandments, "thou shalt not kill" would be one of the more prominent ones. But do you believe that you can be forgiven for that? . . . If you asked God for forgiveness, do you believe that He'll forgive you for that? You can repent your sins, can't you?

"Yes, yes, anybody can repent their sins," Runyon stated. Rilee responded, "Having that in mind, you know, don't you think it's time to repent, to say that you're sorry for what happened . . . ?" Runyon answered, "It sounds like to me that I need a lawyer," at which point the interrogation effectively ended.

Runyon further argues that several additional portions of the video were likewise improperly inflammatory. Whatever the force of those arguments might be, this court need proceed no further than the officers' comments referencing Runyon's ethnicity and religion to conclude that the video had no place at this sentencing proceeding. The government contends that these comments were not problematic because, first, they "were not addressed to the jury" but were instead "intended to elicit truthful information from [the] defendant" and, second, they "appealed not to negative aspects of Runyon's character, but to positive aspects of his identity." Appellee's Br. 33. For the reasons that follow, we find these arguments unpersuasive.

The Supreme Court has long made clear that statements that are capable of inflaming jurors' racial or ethnic prejudices "degrade the administration of justice." *Battle v. United States*, 209 U.S. 36, 39 (1908). Where such references are legally irrelevant, they violate a defendant's rights to due pro-

cess and equal protection of the laws—whether the remarks occur during the prosecution's presentation of evidence or argumentation. *See, e.g.*, *Bains v. Cambra*, 204 F.3d 964, 974 (9th Cir. 2000); *United States v. Vue*, 13 F.3d 1206, 1212-13 (8th Cir. 1994); *United States v. Doe*, 903 F.2d 16, 24-25 (D.C. Cir. 1990); *see also McCleskey v. Kemp*, 481 U.S. 279, 309 & n.30 (1987). And the Supreme Court has taken pains to ensure that racial prejudice plays no role in jury deliberations in capital sentencing proceedings. *See, e.g.*, *Turner v. Murray*, 476 U.S. 28, 36-37 (1986) (holding that "a capital defendant accused of an interracial crime is entitled to have prospective jurors . . . questioned on the issue of racial bias").

While it is certainly true that district judges must weigh the "probative value" of evidence against "the danger of creating unfair prejudice" in each case under the FDPA, 18 U.S.C. § 3593(c), we think that the particular references to ethnicity here were problematic for several reasons. One, the references came directly from the mouths of law enforcement. Two, they directly alluded to the defendant himself. Three, they bore no relevance to the particular issues that the jury was being asked to resolve. And four, they conveyed what were, frankly, stereotyping and insulting notions about how "an honorable Asian man" is supposed to act. Thus, while it is admittedly impossible to script all-or-nothing answers to evidentiary questions on appeal, the error in admitting the statements at issue here is apparent.

We are compelled to reach the same conclusion with respect to the discussion of Runyon's religion. The Supreme Court has held that the First Amendment "prevents [the prosecution] from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried." *Dawson v. Delaware*, 503 U.S. 159, 168 (1992). Here, the government makes no argument that the video's references to Runyon's faith were germane to the question of what sentence he should receive, nor is any such argument apparent to the court. There is no indica-

tion that the killing was motivated by or connected to Runyon's Christianity at all, and the discussion of his religion did not serve to rebut any mitigating evidence offered by the defense. *See id.* at 166-68. Like Runyon's ethnic background, neither his Christian beliefs nor the implication that he somehow betrayed those beliefs by failing to "repent his sins" was legally relevant in any way. Likewise, this exchange was flawed for evidentiary purposes because the offending statements were made by law enforcement officers and were personally targeted at the defendant. It was accordingly error for the jury to hear these remarks.

As mentioned above, Runyon further contends that a number of other comments made by the officers in the video were improperly inflammatory. These involve statements in which the officers expressed opinions about the crime, Runyon himself, and how a jury might ultimately decide his fate—including statements implying that Runyon's refusal to confess might render him subject to capital punishment:

- "But don't let me walk out of that, that door right there thinking that you're some piece of shit that murdered a U.S. naval officer and didn't have enough respect to man up when he—when it was done."

- "He didn't deserve to die like a dog."

- "I don't have any disrespect for you at this point, but if you don't have enough integrity, enough honor about yourself to tell the truth at this point, then I won't have any respect for you. And as a matter of fact, when they make a choice as to whether they charge you with capital murder and seek the death penalty, I'll remember exactly how honorable you were, or not . . . ."

- "It makes a difference in the way that the jury is gonna perceive you when you go to trial. It's

either gonna be, 'well this is a cold-blooded mur-
derer' or 'this is a guy who made a mistake.' . . .
[T]hat's what they're going to think about when
they're deciding how this can end up for you."

- "But I want you to sit back and I want you to
think about, in front of a jury of twelve, twelve
citizens, okay? About this family right here, this
whole family is torn apart. . . . And David Run-
yon is going to be the one that did that—that
physically did it. Without David Runyon's coop-
eration, without David Runyon's honesty and
remorse for what he did, what do you think
twelve reasonable people would, uh, conclude
from that? . . . [T]hey're going to make you out
to be a monster, man."

Runyon claims that the jury's consideration of these state-
ments offended the Eighth Amendment by inviting applica-
tion of the death penalty in an arbitrary and capricious manner
under precedent stemming from *Furman v. Georgia*, 408 U.S.
238 (1972). Moreover, he offers additional arguments as to
why introduction of the interrogation video was erroneous.
First, he contends that the video was inadmissible on the lack-
of-remorse aggravator because it did not actually provide any
evidence relevant to the issue of remorse. He further argues
that the video was irrelevant to rebutting the equally-culpable
mitigator because evidence of conduct *after* the crime is
immaterial to a defendant's culpability "*in* the crime," per the
text of the FDPA. 18 U.S.C. § 3592(a)(4) (emphasis added).
Next, Runyon asserts that he sufficiently invoked his Fifth
Amendment right to remain silent during the interrogation and
that introduction of the video therefore violated the principles
set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), and its
progeny. And finally, he contends that even if some portions
of the video were pertinent to certain questions before the
court, its admission as a whole was nevertheless unfairly prej-
udicial under the FDPA.

In response to Runyon's Eighth Amendment argument concerning inflammatory statements made by the officers, the government contends that "statements by detectives, made in the course of the investigation, and not referred to by the prosecutor, cannot be attributed to the government deliberately introducing prejudicial or arbitrary matters." Appellee's Br. 36. As for Runyon's other claims, the government first responds that the video was admissible as to the lack-of-remorse aggravator because Runyon's refusal during the interrogation to take responsibility for his actions, along with his general demeanor when faced with the officers' questions, conveyed a complete absence of contrition. And with regard to the video's relevance to the equally-culpable mitigator, the government contends that culpability is a continuing moral concept that does not simply shut off once a crime has been committed. Further, in response to Runyon's Fifth Amendment self-incrimination claim, the government argues that evidence of a defendant's demeanor while sitting silent is meaningfully distinct from evidence of silence itself and, in any event, that Runyon never unambiguously invoked the right to remain silent after receiving *Miranda* warnings, as required by *Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010). And finally, for all of these reasons, the government rejects the defense's argument that admission of the video unduly prejudiced Runyon.

The parties proceed to argue at some length over these additional claims of error pertaining to the video. Nevertheless, because we have established that the court erred in admitting the video due to the particular references to ethnicity and religion described above, we need not consider what other reasons may or may not exist for coming to the same conclusion. To be sure, one could argue that the trial court's error extends only to any offending portions of the video. In the interest of caution, however, we will assume that exclusion of the entire video was warranted. Moreover, as discussed in greater detail below, we shall elect to apply the most

defendant-favorable standard possible in order to determine whether this error requires reversal of Runyon's sentences.

2.

The parties vigorously dispute the proper standard for deciding whether Runyon's sentences must be reversed on account of the erroneous admission of the interrogation video. The defense asserts that because certain of Runyon's arguments are constitutional in nature, the government must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). The government, in contrast, contends that Runyon did not properly preserve his constitutional arguments before the district court and that plain error analysis pursuant to *United States v. Olano*, 507 U.S. 725 (1993), thus applies.

We note that although Runyon's counsel did object strenuously to the introduction of the video below, the argument was premised predominantly, even exclusively, on the notion that the video did not properly rebut the defense's evidence on the equally-culpable mitigator for several statutory and evidentiary reasons. Nevertheless, because we find for the following reasons that admission of the interrogation video constituted harmless error even under the most stringent of standards, we proceed pursuant to *Chapman*. *See United States v. Williams*, 461 F.3d 441, 448 (4th Cir. 2006) (electing to apply *Chapman* where not necessarily required).

As a threshold matter, the fact that the district court provided a detailed limiting instruction specifically circumscribing the jury's consideration of the interrogation video is significant. The court stated:

> During the government's rebuttal evidence, it played for you a videotape of an interrogation of the defendant, David Anthony Runyon. This evidence was

offered for the limited purposes of demonstration of remorse in regard to the alleged nonstatutory aggravating factor to this effect, and for relevant culpability in regard to the alleged statutory mitigation factor to this effect.

You are instructed that no statement made by the detectives during the interrogation is itself evidence in this case. You should disregard any statements of fact or opinion made by the interrogating officers, including any speculation about a future jury's possible sentencing decision or the punishment that the defendant might receive, or any characterization by the officers of the defendant's conduct or character. These portions of the video could not be removed without making the interrogation itself unintelligible, but they should not be considered by you in deciding on defendant's sentence.

In addition, in accordance with the directive stated in 18 U.S.C. § 3593(f), the court delivered the following more general—but equally unequivocal—instruction establishing the impropriety of considering Runyon's ethnicity or religious affiliation:

In considering whether a death sentence is justified, you must not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim in this case. These facts are completely irrelevant to the important issues you must consider at this phase of the proceedings. You are not to recommend a sentence of death unless you have concluded that you would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of either the defendant or the victim might have been.

To emphasize the importance of this consideration, the special verdict form has a certificate that

must be signed by each juror. When you have reached a decision, each of you is to sign the certificate, but only if this is so, attesting that considerations of race, color, religious beliefs, national origin, or sex of the defendant or the victim w[ere] not involved in reaching your individual decision, and attesting that you would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or victim might have been.

Each juror signed the certificate.

Our analysis is governed, first and foremost, by the "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). The assumption would certainly apply in a case such as this one, where a certificate was signed and where the limiting instructions were so clear and emphatic. The assumption has become axiomatic because it is so essential to the efficient functioning of the criminal justice system. "Not every admission of inadmissible . . . evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." *Bruton v. United States*, 391 U.S. 123, 135 (1968). Accordingly, absent some specific "reason to doubt that the jury . . . adhered to the district court's directive," this court will not conclude to the contrary. *United States v. Castillo-Pena*, 674 F.3d 318, 322 (4th Cir. 2012).

We see no such reason here. Nevertheless, we note that whereas the district court's instructions are naturally read to neutralize the officers' statements in the video, Runyon's challenge goes further. Specifically, Runyon objects to admission of the video in its entirety—including his responses, verbal and nonverbal alike, to the officer's questions. We

therefore consider, and find convincing, additional grounds establishing the harmlessness of introducing the video at all, focusing in particular on the limited purposes for which the court permitted the jury to consider it: the lack-of-remorse aggravator and the equally-culpable mitigator.

The government has demonstrated beyond a reasonable doubt that the jury would not have voted any differently on the lack-of-remorse aggravator in the absence of the interrogation video. The prosecution's argument that Runyon exhibited no remorse for killing Voss rested on evidence of at least four classes of affirmative conduct and speech on Runyon's part, none of which depended on the video for proof. Runyon (1) bragged about being a hitman to at least three people following the shooting; (2) attempted to collect on the contract after the murder; (3) schemed for months to conceal evidence and mislead law enforcement officers about his role in the conspiracy; and (4) groused crudely about the investigation in recorded phone calls—including describing the accumulated evidence as "circumstantial bullshit" and declaring that "[i]f they don't watch themselves before it's all said and done they're gonna have a fucking civil lawsuit for harassment." By contrast, the defense never attempted to argue that Runyon exhibited remorse in any way. Hence, we find that "[e]ven without considering [the tainted evidence], the jury could not reasonably have reached another conclusion regarding lack of remorse." *United States v. Caro*, 597 F.3d 608, 631 (4th Cir. 2010).

We are likewise convinced beyond a reasonable doubt that introduction of the interrogation video was harmless with respect to the equally-culpable mitigator—namely, that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C. § 3592(a)(4). The fact that the jury accepted the defense's arguments on this factor, unanimously finding in Runyon's favor, is dispositive. Hence, this evidence did not detract from Runyon's defense. Introduction of the video, therefore, neither encouraged the

jury to find any inadequately supported aggravator nor discouraged the jury from finding any adequately supported mitigator, leaving the slate of factors in the aggravator-versus-mitigator computation required by the FDPA unaltered.

Nor do we believe that the overall balancing of these factors could have possibly produced a different result. The *Chapman* standard requires review of "the record *as a whole* to determine the probable impact of the improper evidence on the jury." *Williams*, 461 F.3d at 448-49 (emphasis added) (internal quotation marks omitted). Thus, erroneously admitted evidence cannot be assessed in isolation. Viewed quantitatively, the interrogation video comprised an insignificant portion of the proceeding, consuming less than an hour of a combined trial and sentencing lasting longer than three weeks and featuring five days of evidence and thirty-seven witnesses during the sentencing portion alone. *See United States v. Stitt*, 250 F.3d 878, 898 (4th Cir. 2001) (finding admission of improper evidence harmless in death penalty case where such evidence "comprised only a fraction of the total testimony heard during the penalty phase").

The video was likewise inconsequential from a qualitative perspective. What ultimately drove the jury's decision was not some video but the overpowering evidence of Runyon's guilt, his pivotal role in the crime, and the exceptionally callous nature of his conduct. With three fatal shots to the chest and abdomen, Runyon robbed an innocent man of his life and two small children of their father. And for what? Money. The aggravating factors found by the jury—including that Runyon sought pecuniary gain, engaged in substantial planning and premeditation, and utilized his military and criminal justice background to facilitate his actions—reflect the utter heartlessness of this horrific homicide, providing an abundant basis for the verdict. *See Stitt*, 250 F.3d at 898-99 (finding error harmless in light of "the overwhelming force of the aggravating factors found by the jury which showed the violent and

predatory nature of [the defendant's] character and activities").

Moreover, even beyond the equally-culpable mitigator, Runyon's counsel had the opportunity—entirely untainted by the interrogation video—to present a multitude of arguments for leniency. Specifically, the defense proposed fourteen mitigating factors and offered testimony from nearly two dozen witnesses during the penalty selection phase alone, all in hopes of dissuading the jury from recommending the death penalty. The defense's evidence ranged from Runyon's childhood and character to his relationships and employment history—and even to his pre-trial conduct in jail and ability to adjust to prison in the event he received a life sentence. Nevertheless, although the jury did find several mitigators in Runyon's favor, the case for clemency simply did not overcome in the jury's eyes the case presented by the government.

We recognize, of course, that where "record review leaves the conscientious judge in grave doubt about the likely effect of an error," the error should be treated "as if it affected the verdict." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). But we have no doubt that the error in admitting the interrogation video "did not contribute to the verdict obtained," *Chapman*, 386 U.S. at 24, and that reversal is consequently unwarranted.

## B.

A second nonstatutory aggravating factor charged that Runyon "caused injury, harm and loss to the victim and the victim's family and friends." To prove this factor, the prosecution introduced various items of "victim impact" evidence. These included the testimony of Jennifer Kime, a former Navy officer, and Lieutenant Jeremy Chayer, both of whom served with Voss on the USS Elrod, as well as a video and an approximately nine-minute montage of photographs of Voss, both of which were shown during his memorial service aboard the Elrod. Kime and Chayer testified about their

friendships with Voss, his Navy service, and the impact of his death on them and on the Elrod's crew more generally, while the video contained statements by Chayer and Commander Matthew Graham reminiscing about Voss.

Runyon objected below, and argues on appeal, that this aggravator violated both the Constitution and the FDPA insofar as it included (1) the impact of Voss's death on his friends and colleagues, rather than just his family, and (2) Voss's professional contributions as a Navy officer, rather than just his personal relationships with specific individuals. We consider Runyon's constitutional and statutory challenges to the factor de novo and review the district court's decision to admit certain evidence on that factor for abuse of discretion. *United States v. Higgs*, 353 F.3d 281, 320, 322 (4th Cir. 2003).

1.

Runyon first contends that both the Eighth Amendment and the FDPA limit the scope of victim-impact evidence in a capital sentencing proceeding to the impact of the crime on the victim's family and that the nonstatutory aggravating factor transgressed these limits by bringing before the jury the impact of Voss's death on his friends and shipmates.

Neither the constitutional nor the statutory argument succeeds. Runyon's constitutional argument relies on the Supreme Court's decision in *Payne v. Tennessee*, 501 U.S. 808 (1991). In holding that the introduction of victim-impact evidence during capital sentencing did not necessarily violate the Eighth Amendment, the *Payne* Court understood such evidence to include "evidence about the victim and about the impact of the murder on the victim's family." 501 U.S. at 827. Runyon takes this statement for an exhaustive definition, one that implicitly prohibits the introduction of evidence concerning the impact of the victim's death on any individuals other than "the victim's family."

Runyon's reading, however, is a stretch. As even he concedes, "certain language used by the majority . . . opinion[ ] could be read as suggesting approval of a broader range of evidence." Appellant's Opening Br. 66. Indeed, on multiple occasions, the *Payne* Court expressly countenanced the introduction of evidence concerning the impact of the victim's death on society at large. *See, e.g.*, *id.* at 822 (noting that the prosecution should be permitted to "demonstrat[e] the loss to the victim's family *and to society* which has resulted from the defendant's homicide" (emphasis added)); *id.* at 825 ("[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss *to society* and in particular to his family." (emphasis added) (internal quotation marks omitted) (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting))).

In light of these statements, we see no reason to think that the *Payne* Court intended to forbid the introduction of evidence regarding the impact of the victim's death on his friends and colleagues as well as his family. For limiting victim-impact evidence to family would be an exceedingly artificial line to draw. While the most devastating sense of loss from a murder may well be felt by immediate family, the deceased's friends and colleagues may suffer too. Just as individuals may touch many people during life, so too may their death be widely mourned. It was thus well within the district court's discretion to admit the expressions of grief felt by Voss's shipmates for the loss of one of their own. Kime, for instance, testified that "[e]verybody [aboard the Elrod] was shocked, and everybody was upset," while Chayer similarly reported that "[e]veryone on board, from the captain all the way down to the new seaman recruit that checked in the day before, loved him." In reading *Payne* to allow such evidence, we are in good company. *See, e.g.*, *United States v. Whitten*, 610 F.3d 168, 187-88 (2d Cir. 2010); *United States v. Bolden*,

545 F.3d 609, 626 (8th Cir. 2008); *United States v. Barrett*, 496 F.3d 1079, 1098 (10th Cir. 2007); *United States v. Bernard*, 299 F.3d 467, 478 (5th Cir. 2002).

Runyon's statutory argument is equally strained. Echoing his constitutional argument, Runyon emphasizes the provision of the FDPA providing that nonstatutory aggravating factors

> may include factors concerning the effect of the offense on the victim and the victim's *family*, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's *family*, and any other relevant information.

18 U.S.C. § 3593(a)(2) (emphases added). Once again, Runyon takes the references to "the victim's family" to preclude evidence regarding the impact of the victim's death on his friends and colleagues.

But once again, Runyon is creating restrictions on victim-impact evidence out of whole cloth. Contra Runyon's interpretation, the text of this provision is illustrative rather than exhaustive, identifying some kinds of aggravating factors and evidence that the prosecution's notice to the defendant "*may* include" and concluding with a catchall permitting the prosecution to present "any other relevant information." Runyon's narrower reading, moreover, is in tension with the provision of the FDPA permitting the jury to "consider whether *any other aggravating factor* for which notice has been given exists." *Id.* § 3592(c) (emphasis added). Based on the broad language of the provision cited by Runyon, other circuits have consistently construed the FDPA to allow the prosecution to introduce evidence concerning the impact of the victim's death on individuals outside his family. *See, e.g.*, *Whitten*, 610 F.3d at 188-89; *Bolden*, 545 F.3d at 626; *Barrett*, 496 F.3d at 1098-99. We see no reason to hold otherwise.

2.

Runyon also challenges the victim-impact aggravator on the ground that some of the evidence introduced to support it concerned Voss's professional accomplishments as a Navy officer, rather than being limited to his relationships with specific individuals (family members or otherwise). Both Kime and Chayer, for instance, testified about Voss's position and duties aboard the Elrod—testimony that, according to Runyon, exceeded constitutional and statutory limits on victim-impact evidence.

These putative limits, however, lack a sound legal basis. On the contrary, *Payne* expressly allowed the prosecution to provide "a quick glimpse of the life" of the victim and his "uniqueness as an individual human being," 501 U.S. at 822, 823, and nothing in the FDPA purports to restrict this use of victim-impact evidence. Other circuits have accordingly upheld the introduction of evidence regarding the victim's professional background and accomplishments. *See, e.g.*, *Whitten*, 610 F.3d at 189; *Barrett*, 496 F.3d at 1099; *Bernard*, 299 F.3d at 479. And for good reason. As the *Payne* Court explained, to forbid the prosecution to give the jury a sense of the victim's background would be to "unfairly weight[ ] the scales in a capital trial," given that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." 501 U.S. at 822.

We would countenance such unfairness here were we to declare the evidence concerning Voss's Navy service inadmissible. The prosecution's aggravation case was already less extensive than the defense's mitigation case. To take just one measure: whereas the prosecution called only fourteen direct and two rebuttal witnesses during the penalty selection phase, the defense called twenty-one mitigation witnesses. The district court was well within its discretion in seeking to ensure some sense of balance in the parties' presentations. The evi-

dence concerning Voss's Navy service did nothing more than help to provide "a quick glimpse" of the central aspect of his professional life—and thus accorded with both the Eighth Amendment and the FDPA.

C.

A third nonstatutory aggravating factor charged that Runyon "utilized education, training and experience that he received in college courses focused on criminal justice, as a law enforcement and correctional officer, as an officer of the Kansas National Guard and as a member of the United States Army to kill Cory Voss." The prosecution sought to prove this factor by introducing evidence that Runyon had attended a Junior ROTC military academy; served as an officer in the Kansas National Guard; completed courses in criminal justice and law enforcement; trained and worked as a corrections officer for the Kansas Department of Corrections; served as an enlisted member of the United States Army; attended peace-officer training; worked for a Georgia police department; and received weapons training for many of these positions. Drawing on all this experience, the prosecution contended, Runyon perpetrated the murder "in the manner of a professional 'hit'": planning the crime meticulously, dispatching Voss efficiently, and leaving behind so few forensic clues that it took investigators more than seven months to amass enough evidence to justify an arrest.

Runyon challenges this aggravating factor on the grounds that it is impermissibly vague and overbroad, is actually mitigating rather than aggravating, and was supported by insufficient evidence. We consider Runyon's first and second challenges, which are constitutional in nature, de novo. *Higgs*, 353 F.3d at 320. As for his third challenge, we consider "whether the evidence supports the special finding of the existence of" the aggravating factor. 18 U.S.C. § 3595(c)(1).

## 1.

Runyon first argues that this factor of his training and experience is unconstitutionally vague and overbroad in a manner that renders the imposition of capital punishment arbitrary and capricious under the Eighth Amendment. He does not press his vagueness argument with much conviction, and it is easy to see why. An aggravating factor may not be so indeterminate that it effectively leaves jurors with unbridled discretion, for during both the eligibility phase and the penalty selection phase, "[t]he State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 973 (1994). At the same time, however, vagueness review is "quite deferential." *Tuilaepa*, 512 U.S. at 973. Accordingly, "a factor is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'" *Id.* (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976) (White, J., concurring in the judgment)).

The aggravating factor at issue here easily satisfies this test. The Supreme Court has tended to invalidate as vague only those factors that contain "pejorative adjectives . . . that describe a crime as a whole," such as "heinous" and "cruel," and that are not further elucidated by case law, jury instructions, or the prosecution's evidence and arguments. *Arave v. Creech*, 507 U.S. 463, 472 (1993). In contrast, the meanings of the constituent terms of the factor at issue here—in particular, "education, training and experience"—are readily grasped, especially when considered in light of the specific evidence of Runyon's background that the prosecution introduced. We thus have no trouble concluding that the factor was not unconstitutionally vague.

Runyon's overbreadth challenge fares no better. An aggravator is unconstitutionally overbroad "if the sentencer fairly could conclude that [the] aggravating circumstance applies to *every* defendant" eligible for the death penalty, such that the

factor fails to sufficiently narrow the class of offenders who may receive that punishment. *Id.* at 474. That was so here, Runyon contends, because the expertise he allegedly employed in committing the murder—namely, expertise "in the use of firearms," "in the use of force and controlling inmates in confined spaces," and "in investigative techniques" —is actually commonplace knowledge possessed by countless people.

It is simply not the case, however, that "the sentencer fairly could conclude that [the] aggravating circumstance applies to *every* defendant." *Id.* This is because the prosecution success-fully established that Runyon's weapons and forensic exper-tise extended far beyond any basic knowledge arguably held by the majority of murderers. Not every murder defendant possesses specialized firearms proficiency obtained through professional military and law enforcement training. Not every murder defendant has honed advanced investigative tech-niques while working in a police department. By its own terms, the aggravating factor distinguishes Runyon from the "mine-run" of murder defendants and thus is not overbroad.

2.

Even if this aggravator was neither vague nor overbroad, Runyon insists that it nevertheless violated the Eighth Amendment because it cited elements of his background—to wit, his career in the military and law enforcement—that dem-onstrate service to his country and community, rendering the factor actually mitigating rather than aggravating.

The prosecution may not, of course, adduce as aggravators those circumstances "that actually should militate in favor of a lesser penalty," a distortion that would render the jury's decisionmaking "arbitrary and capricious." *Zant v. Stephens*, 462 U.S. 862, 885 (1983). But that did not happen here. Rather, both Runyon and the prosecution invoked related but distinct elements of his background to advance their respec-

tive arguments. Specifically, whereas Runyon argued that his *service* in the military and law enforcement mitigated his culpability, the prosecution argued that he exploited the *skills* acquired during that service to perpetrate the homicide. The jury could obviously distinguish these mutually consistent contentions, for while it ultimately accepted the prosecution's aggravation argument, it also accepted Runyon's argument about his military service. This result confirms that the aggravator did not describe a mitigating circumstance and thus posed no risk of distorting the jury's deliberations.

### 3.

Finally, Runyon argues that there was insufficient evidence for the jury to conclude that he used whatever special training and experience he had to orchestrate and execute the crime. More specifically, he contends that the prosecution proved neither that he planned the crime, as opposed to merely following Cat and Draven's instructions, nor that he used his experience to carry it out. On the contrary, he insists, anyone with a gun and a modicum of intelligence could have perpetrated the crime in the manner he did: carjack someone at an ATM, force him to drive a short distance, and then shoot him five times at close range—all the while making sure to leave virtually no forensic trail.

Runyon was perfectly entitled to make these arguments to the jury—and he did. But he may not complain now simply because the jury rejected his reading of the evidence. We must, of course, determine "whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592 [of the FDPA]." 18 U.S.C. § 3595(c)(1). Moreover, "[t]he burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt." *Id.* § 3593(c).

The prosecution, however, plainly met its burden here, identifying myriad ways in which Runyon's background

helped him to plan and commit the murder. For example, as discussed above, the police discovered in Runyon's vehicle a checklist of items to be used in the murder, as well as a map of Newport News showing the location of the LFCU and containing handwritten references to Voss and the car he would be driving—strong evidence that Runyon planned certain details of the plot, even if Cat and Draven hatched it. Such meticulous planning, the prosecution argued, reflected Runyon's training as a soldier and law enforcement officer, as did his selecting a secluded location for the "hit" and his ordering Voss to drive around the LFCU a second time in order to make the murder appear to be a random robbery. His training also undoubtedly helped him to commit the lethal act itself, as soldiers and law enforcement officers are trained to aim for a target's "center mass"—precisely where the fatal bullets fired from Runyon's gun lodged in Voss's body. And while it may be "common knowledge that police look for fingerprints and DNA evidence" at crime scenes, as Runyon contends, Appellant's Opening Br. 53, few members of the general public are familiar with specific forensic methods and various ways of frustrating those methods. Runyon was, and the fact that the police found only two bullet casings at the scene and required more than seven months to amass enough evidence to arrest him shows that he was far more successful than the typical murderer in covering his tracks, the most natural explanation for which was his special training and experience. In short, from the ample evidence introduced by the prosecution, the jury could find this aggravator beyond a reasonable doubt.

## D.

The final nonstatutory aggravating factor alleged that Runyon had "engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend." The prosecution sought to prove this factor by introducing evidence of three incidents: (1) Runyon was charged in 1994 with assaulting his former girlfriend, a charge

that was ultimately dismissed; (2) he was convicted in 2001 of a misdemeanor simple battery for grabbing his wife's arm and poking her nose; and (3) a protective order was entered against him in 2007 on petition of another girlfriend, who claimed that he had given her a black eye, though the charges related to this incident were dismissed when the girlfriend failed to appear in court. Based on this evidence, the prosecution argued that Runyon had engaged in "a recurring pattern" of "domestic violence over the past 15 years."

Runyon raises various constitutional, statutory, and evidentiary challenges to this aggravator. We take up each in turn, considering his constitutional and statutory arguments de novo and reviewing the district court's decision to admit evidence of the three incidents for abuse of discretion. *Higgs*, 353 F.3d at 320, 322.

1.

Runyon first argues that the prosecution may not introduce unadjudicated acts to support a nonstatutory aggravating factor for prior misconduct and that the district court consequently erred in admitting evidence of the first and third incidents, neither of which resulted in a conviction. Runyon concedes, as he must, that this court has previously permitted the introduction of unadjudicated conduct to support nonstatutory aggravators for future dangerousness and obstructing justice. *See United States v. Basham*, 561 F.3d 302, 331-32 (4th Cir. 2009) (future dangerousness); *Higgs*, 353 F.3d at 322-23 (obstructing justice). Nevertheless, he insists that the FDPA mandates a different result where, as here, the aggravator is for prior misconduct, since the statute creates a distinct aggravator for when "[t]he defendant has previously been convicted of 2 or more Federal or State offenses, punishable by a term of imprisonment for more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person." 18 U.S.C. § 3592(c)(4). By limiting this factor to prior miscon-

duct of which the defendant stands "convicted," Runyon contends, Congress implicitly precluded the prosecution from introducing misconduct that did not result in a conviction. To hold otherwise, the argument goes, would be to allow the prosecution to circumvent the express limits on prior-misconduct evidence enshrined in the FDPA.

The main problem with this argument is that we explicitly rejected it in *Higgs*. There, while noting that "the FDPA does specify certain types of convicted criminal conduct that may be used as a statutory aggravating factor authorizing imposition of the death penalty," we emphasized that "it also provides that '[t]he jury . . . may consider whether any other aggravating factor for which notice has been given exists,'" an expansive provision that bespeaks Congress's intent to afford the prosecution leeway in deciding which aggravating factors to propose. *Higgs*, 353 F.3d at 323 (quoting the catch-all provision in 18 U.S.C. § 3592(c)). To be sure, nonstatutory aggravating factors are subject to constitutional limits, but the Supreme Court, in upholding a similarly focused aggravator in *Tuilaepa*, gave no indication that a distinction between adjudicated and unadjudicated conduct was dispositive. 512 U.S. at 976. Indeed, the statute at issue in *Tuilaepa* allowing the jury to consider the defendant's prior "criminal activity" expressly provided that, "[a]s used in this section, criminal activity does not require a conviction." Cal. Penal Code § 190.3.

Because we find no basis in either the FDPA or the Constitution for excluding unadjudicated conduct from consideration as an aggravating factor, we conclude that the district court did not err in admitting evidence of Runyon's prior acts of domestic violence simply because some of them did not result in a conviction.

2.

According to Runyon, whether adjudicated or unadjudicated, all the prior acts of domestic violence cited by the pros-

ecution were "relatively minor," in that the charges arising from them either were dismissed or resulted in, at most, a misdemeanor conviction. Appellant's Opening Br. 61. Only more "serious" misconduct, Runyon contends, may be used to support a death sentence. He once again bases this argument on the FDPA's aggravating factor for prior convictions, which comprehends only "offenses, punishable by a term of imprisonment for more than 1 year, . . . involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person." 18 U.S.C. § 3592(c)(4). Why, Runyon asks, should the prosecution be permitted to introduce minor misconduct as a nonstatutory aggravator if it may not introduce such misconduct under the statutory aggravator?

We reject this "minor misconduct" argument for the same reason we rejected Runyon's argument regarding unadjudicated misconduct: nothing in the FDPA suggests that we should read the express aggravating factor for prior convictions to limit the provision permitting the jury to consider "any other aggravating factor" asserted by the prosecution. *Id.* § 3592(c). The whole purpose of the aggravator/mitigator structure is to provide a broad umbrella under which each party may advance its most compelling arguments, leaving the jury as the ultimate arbiter of their weight. Nor does the Constitution preclude the jury from considering less serious convictions and charges—at least those that involve the use of force or threat thereof. *See Tuilaepa*, 512 U.S. at 976 (upholding a California aggravating factor that permitted the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" (alteration in original)).

In all the incidents cited by the prosecution, Runyon attempted, used, or threatened force or violence against another person. One may, of course, debate at length the relative seriousness of each of the incidents, and Runyon was free to contest the gravity or even the occurrence of each episode

in whatever manner he saw fit. But he had proper notice of the government's intent to propose the aggravator, and neither the Constitution nor the FDPA barred the jury from considering the evidence supporting it.

3.

More generally, Runyon faults the district court for failing to exclude much of the evidence of the three incidents of domestic violence as unreliable, especially given that the first incident occurred about thirteen years before Voss's murder and the third was based almost exclusively on what Runyon claims was inconsistent testimony from his former girlfriend. This argument, however, sorely misunderstands the district court's role, for it is the jury, not the judge, that determines whether the evidence offered by the prosecution is sufficiently reliable to support an aggravating factor. Although the jury must make this finding "beyond a reasonable doubt," 18 U.S.C. § 3593(c), an instruction reminding the jury of this requirement adequately guards against the risk that unreliable evidence will taint its decision. *See Higgs*, 353 F.3d at 323. The district court so instructed the jury here and rightly declined to usurp its traditional fact-finding function.

Nevertheless, Runyon further argues that the district court should have excluded the evidence of the three incidents even if it was reliable, since "its probative value [was] outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Although the government contends that Runyon failed to preserve this argument for appeal, we assume that Runyon's claim in his motion to the district court that "the prejudice outweighs the probative value" sufficed to put the district court on notice that he was objecting under section 3593(c). But ultimately this is of no avail to Runyon, for it is within the district court's sound discretion to weigh the potential prejudicial effect of proffered evidence against its probative value, and the district court did not abuse its discretion here.

V.

Runyon next challenges, on constitutional grounds, various statements made by the prosecution during the closing arguments of the penalty selection phase. His objections to these comments can be classified as, first, arguments that the prosecution violated the Fifth and Sixth Amendments by inviting the jury to make unfavorable inferences from his exercise of these rights and, second, arguments that certain remarks were impermissibly inflammatory as a more general matter. The Supreme Court has observed that "[w]hen specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). By contrast, when such provisions are not at issue, a finding of error as to a prosecutor's remark requires that it "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process." *Id.*

Before we consider Runyon's specific claims, a general point bears emphasis. The Constitution does not strictly limit what the prosecution may say during its summation. On the contrary,

> great latitude is accorded counsel in presenting closing arguments to a jury. In our adversary system, prosecutors are permitted to try their cases with earnestness and vigor, and the jury is entrusted within reason to resolve heated clashes of competing views. . . . To be sure, there are some lines that prosecutors may not cross. But to parse through a prosecutor's closing statement for minor infelicities loses sight of the function of our adversary system, which is to engage opposing views in a vigorous manner.

*United States v. Johnson*, 587 F.3d 625, 632-33 (4th Cir. 2009). Thus, while courts should not hesitate to condemn those prosecutorial comments that truly offend constitutional

norms, neither shall we attach constitutional significance to every verbal fillip, lest we unduly censor the clash of viewpoints that is essential to adversarial proceedings. With this caveat in mind, we turn to Runyon's arguments.

A.

1.

We first consider Runyon's contention that the prosecution's closing argument infringed his Sixth Amendment rights by impugning his decision to proceed to trial. Runyon points specifically to the following excerpt:

> Cat Voss and Michael Draven did both admit their conduct when they were confronted with it. The justice system always considers acceptance and remorse when determining punishment. Catherina Voss showed this. Her actions are despicable. But take a look at her plea agreement. She pled guilty, and she agreed to everything in that statement of facts which showed her guilt. Did David Runyon do that? Is that a difference between the two of them that you can consider? It is.

> You can look at her plea agreement and see that she did not contest her guilt, did not have someone, a jury, weigh in on all the evidence and determine whether she was guilty. She pled guilty to all of the charges in the indictment . . . .

A "request for trial by jury" may not be treated "as an aggravating circumstance" in a capital sentencing proceeding. *Zant v. Stephens*, 462 U.S. 862, 885 (1983); *see also United States v. Jackson*, 390 U.S. 570, 581-83 (1968) (invalidating a federal statute exposing to the death penalty only defendants who went to trial because "[t]he inevitable effect of any such provision, is of course, to discourage assertion of the Fifth

Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial"); *United States v. Whitten*, 610 F.3d 168, 194 (2d Cir. 2010) ("[A] capital-sentencing scheme cannot allow the jury to draw an adverse inference from constitutionally protected conduct such as a request for trial by jury . . . .").

Under this standard, the prosecution's statements were plainly problematic—particularly with regard to the clear reference to Runyon "hav[ing] someone, a jury, weigh in on all the evidence and determine whether [he] was guilty." The prosecution's words, however, did not come out of the blue. Rather, the prosecution's statements were tendered in rebuttal to the equally-culpable mitigator, which the defense had made a centerpiece of the proceeding. Indeed, Runyon's counsel had gone to great lengths to demonstrate that the three defendants, despite all being integrally involved in the murder, had received differential treatment, with the government pursuing the death penalty against Runyon but not against Cat or Draven. In particular, the defense introduced Cat's plea agreement and the accompanying statement of facts, which recited her role in the crime in stark detail, and argued vigorously and repeatedly before the jury that Runyon did not deserve death if neither Cat nor Draven was subject to that sentence.

Runyon, of course, had every right to focus the jury's attention on the equally-culpable mitigator. But the prosecution, in turn, had every right to rebut it— including, within constitutional and statutory bounds, by explaining the government's charging decisions. In light of these complexities of context, whether it was necessary or appropriate for the prosecution to juxtapose Runyon's decision to proceed to trial with Cat's and Draven's decisions to confess—and Cat's further decision to plead guilty—remains open for question. Given our ultimate disposition of Runyon's Sixth Amendment claim, however, we need not answer that question at this point. Instead, we will simply assume for the sake of argument that it was error for the jury to hear these statements.

Next, Runyon raises a Fifth Amendment Self-Incrimination Clause challenge to several statements from the prosecution's closing argument relating to his refusal more generally to admit any involvement in the killing, including:

- "You saw his demeanor when being questioned in the [videotaped] interview yesterday by Detective Rilee. You can see, ladies and gentlemen, . . . how he is trying to come up with an explanation, and you can see there, you can see by his demeanor, of his guilt. But you can also see how unaffected he is by the crime that he has committed."

- "You saw they had a picture on the table there of Cory Voss. David Runyon would pick up that picture and just set it down. No attempts to atone for what he did. The opportunity to cooperate and talk about his involvement was given to him, given to him before it was given to any of the other defendants, and he rejected that. He sat stone-faced after being confronted with all this evidence and expressed no remorse, no regret whatsoever. He turned away every effort that was extended to him to try and put things right, to try and make amends for this horrible crime he has committed."

- "You know that David Runyon has expressed absolutely no regret for his actions following the murder of Cory Voss."

- "The next mitigator is that the other defendants are equally culpable . . . . But there are differences in their conduct, differences that you will have to consider. . . . You also know that the other defendants did express and did admit their involvement in the crime. They took some

actions to express remorse or atone for their crimes, and David Runyon has never done that."

- "Mercy follows remorse and repentance, ladies and gentlemen, and that's a principle in our justice system, that when people admit their wrongs, when people [show] some sort of acceptance of responsibility and show remorse, they can be extended mercy. . . . Has there been any expression of remorse by David Runyon? This case is not about mercy."

As an initial matter, Runyon asserts that these comments all referenced his silence during the videotaped interrogation. He is correct with regard to the first and second statements, and because we have held that it was error for the jurors to see this particular video, we find that it was inappropriate for them to hear these comments as well. We agree with the government, by contrast, that the remaining statements "were removed both in their content and their context from any discussion of the videotape," especially given that other evidence amply supports their substance—to wit, that while Runyon's co-conspirators admitted to and vocalized regret for their roles in the murder, he did not.

As to Runyon's Fifth Amendment claim, this court stated in *United States v. Caro* that "penalizing a capital defendant for failure to articulate remorse burdens his Fifth Amendment privilege against self-incrimination" and that "the Fifth Amendment may well prohibit considering a defendant's silence regarding the non-statutory aggravating factor of lack of remorse." 597 F.3d 608, 629-30 & n.19 (4th Cir. 2010) (citing *Mitchell v. United States*, 526 U.S. 314 (1999); *Estelle v. Smith*, 451 U.S. 454 (1981)). Like the Sixth Amendment question addressed above, this suggestion plainly relates to the principle set forth in *Zant* that a court may not treat "conduct that is constitutionally protected . . . as an aggravating circumstance." 462 U.S. at 885.

It bears emphasis, however, that not *all* silence on the part of a criminal defendant qualifies as "constitutionally protected" within the ambit of *Zant*. For instance, immense controversy surrounds the questions of whether a defendant's silence prior to arrest can be used to prove guilt, *see Salinas v. Texas*, 81 U.S.L.W. 3211 (U.S. Jan. 11, 2013) (No. 12-246) (granting certiorari to decide this issue), and whether a defendant's intermittent refusal to answer questions during a custodial interrogation after receiving *Miranda* warnings constitutes admissible evidence, *see McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 104-05 (3d Cir. 2012) (outlining circuit split). We are thus faced with a complex question in determining whether the Fifth Amendment encompasses the various periods of silence during which Runyon failed to confess or declare contrition throughout the two-plus years between the murder and his trial.

Fortunately, we need not address the matter here. The Supreme Court has explicitly reserved judgment on "[w]hether silence bears upon the determination of a lack of remorse." *Mitchell*, 526 U.S. at 330. And *Caro*—noting the deep circuit split that has developed over the matter—ultimately followed suit, finding that any error on this front would have been harmless. 597 F.3d at 629-30. Because we come to the same conclusion on harmlessness here, as explained below, we shall assume for purposes of argument that the district court also erred in allowing the prosecution to reference Runyon's refusal to express remorse and leave this complicated constitutional question for another day.

2.

In assessing whether the Fifth or Sixth Amendment requires reversal of Runyon's sentences, we note that the defense did not object even once to the prosecution's closing argument during the penalty selection phase below. In all events, however, "the government has met its burden of proving this error harmless" even under the standard applicable to

properly preserved constitutional claims, *United States v. Williams*, 461 F.3d 441, 448 (4th Cir. 2006), because it has established "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," *Chapman v. California*, 386 U.S. 18, 24 (1967).

Excising the portions of the prosecution's closing argument challenged on Fifth and Sixth Amendment grounds would have yielded no change to the jury's sentencing verdict. The challenged statements relate at most to the lack-of-remorse aggravator and the equally-culpable mitigator. As to the former, the prosecution indisputably proved Runyon's absence of contrition on the basis of his affirmative conduct and speech—in particular, his boasting about the murder, seeking payment, concealing evidence and deceiving law enforcement officers, and disparaging the investigation. *See Caro*, 597 F.3d at 631. And as for the equally-culpable mitigator, it is again significant that the jury unanimously voted *for* Runyon on this factor, rendering the prosecution's challenged statements necessarily harmless in relation thereto.

The list of aggravators and mitigators weighed by the jury would thus have been identical with or without the statements of which Runyon complains. Moreover, the comments that Runyon challenges for the first time on appeal comprised but a small fraction of the prosecution's argument—at most three of over forty-five pages of transcript encompassing the prosecution's close. And any error must be set in the context of "the overwhelming force of the aggravating factors found by the jury which showed the violent and predatory nature of [the defendant's] character and activities." *United States v. Stitt*, 250 F.3d 878, 898-99 (4th Cir. 2001). We thus hold that the government has established beyond a reasonable doubt that any Fifth or Sixth Amendment error in the prosecution's closing argument "did not contribute to the verdict obtained," *Chapman*, 386 U.S. at 24, and therefore does not warrant reversal.

## B.

We next consider Runyon's claim that various other comments by the prosecution during its closing argument violated his due process rights. As mentioned above, such comments violate due process if and only if they "so infected the trial with unfairness as to make the resulting [verdict] a denial of due process." *Donnelly*, 416 U.S. at 643. That is, Runyon must show both "(1) that the government's remarks were in fact improper and (2) that the remarks 'prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair [sentencing proceeding].'" *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003) (quoting *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993)).

In determining whether Runyon has made the second showing with respect to any particular comment, we consider a number of factors, including:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Id.* (quoting *Mitchell*, 1 F.3d at 241). Also relevant to this second inquiry is the "the issuance of curative instructions from the court," *Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005) (en banc), which, as already noted, the jury is presumed to follow, *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Although the district court here did not address in its instructions any of the specific comments challenged by Runyon, it did repeatedly admonish the jury to consider only admitted evidence, not lawyers' statements, in selecting a sentence—

admonitions that would perforce counteract any dubious comments made by the prosecution.

With the governing standards thus set forth, we turn to the challenged comments themselves.

1.

At one point during its closing statements, the prosecution said that "Michael Draven was not authorized for the death penalty"—apparently a reference to the government's discretionary decision not to seek capital punishment against him. According to Runyon, this comment impermissibly implied that the United States Department of Justice, in pursuing the death penalty against him but not Draven, had concluded that he was more culpable than Draven.

Tellingly, Runyon cites no precedent of either this court or the Supreme Court forbidding the prosecution to refer to the government's authority to pursue the death penalty against a particular defendant. Moreover, we must consider the comment in context. Runyon implies that it was the prosecution that first mentioned the fact that it had sought the death penalty against Runyon but not Draven. But in fact, it was Runyon's lawyer who raised the issue and imputed the disparate treatment to the government, stating during his closing argument, "Now, I certainly don't make the decision about who they seek the death penalty against. The United States makes that decision."

Runyon's lawyer made this statement in order to show that an allegedly equally culpable participant in the crime would not receive the death penalty, one of the mitigating factors proposed by the defense. Only in responding to this argument, during its rebuttal statement, did the prosecution make the comment challenged by Runyon—as demonstrated by the fact that the prosecution began the relevant section by reminding the jury that defense counsel "spoke about the fact that

Catherina Voss and Michael Draven do not face the death penalty." The comment thus briefly recapitulated an argument that Runyon's lawyer had already made during his summation in order to respond to that argument. Due process does not require the prosecution to leave the defense's mitigation arguments unanswered.

Moreover, Runyon makes little attempt to show that the prosecution's reference to Draven "prejudicially affected [his] substantial rights so as to deprive [him] of a fair trial." *Higgs*, 353 F.3d at 330. And how could he? The prosecution's comment told the jury nothing it did not already know. It already knew that the government was seeking the death penalty against Runyon. It already knew—from myriad pieces of evidence and comments by the parties during both the guilt and penalty phases—that the government had forgone that punishment for Draven. Nor did the comment affect the ultimate outcome, for the jury unanimously found the equally-culpable mitigator, thereby ruling in Runyon's favor on the point he now contests. Nothing about the prosecution's comment violated Runyon's right to due process.

2.

Runyon next contends that the prosecution in its close impermissibly compared the value of his life with that of Voss's. For example, the prosecution claimed that "Cory Voss, of course, as an officer represented what David Runyon never managed to achieve" and that Voss attained "a military and family life that David Runyon might have once coveted but never achieved." In addition, as it extolled Voss's accomplishments as a Navy officer, husband, and father, the prosecution made a number of what Runyon describes as "derogatory and superfluous" comments about Runyon's own life, Appellant's Opening Br. 75, asserting that he "left his wife and children and didn't provide support for them"; "abandoned more gainful attempts at employment, to get employment through these sporadic drug studies that put him

into contact with people like Michael Draven"; met his girl-friend "at a strip bar"; and "play[ed] video games" while his girlfriend held down three jobs. Such comments, Runyon argues, constituted "comparative judgments" regarding the worth of his and Voss's lives and thus violated the limits on victim-impact evidence articulated in *Payne v. Tennessee*, 501 U.S. 808, 823 (1991).

Once again, however, Runyon takes the prosecution's comments out of context. Other than the first two, isolated statements cited by Runyon, the prosecution made no direct "comparative judgments" about the value of his life and Voss's. Rather, it made a number of arguments about Voss's background and then made a distinct set of arguments about Runyon's, with the latter separated from the former by multiple pages in the record. Each set of arguments, moreover, served a legitimate prosecutorial purpose. First, as we have already noted, the prosecution was undoubtedly permitted to introduce evidence providing a "quick glimpse" of Voss's life and to comment on that evidence in its summation. *See id.* at 826. Second, it was also entitled to rebut the defense's mitigating evidence purporting to show that Runyon was, in many respects, an upstanding individual. It thus could not avoid commenting on both Voss's and Runyon's backgrounds over the course of the same summation. Were we to hold that separate descriptions of the victim's and defendant's lives together constitute impermissible "comparative judgments," we would force the prosecution either to forgo argument on a legitimate aggravating factor or not to contest a mitigating factor during summation—a dilemma that the Constitution cannot possibly create.

Moreover, even if some of the prosecution's comments did compare Runyon's life with Voss's, this court has rejected a constitutional challenge to comments that compared the defendant's and victim's lives far more explicitly than did the comments at issue here. *Humphries*, 397 F.3d at 220-26.

3.

In both the opening and rebuttal portions of its summation, the prosecution made a number of comments contrasting the criminal justice system's treatment of Runyon with Runyon's treatment of Voss. For example, it asked the jury to consider that "this protection that has been afforded this defendant, . . . this was a process, these were protections that were never given to Cory Voss." And in response to the defense's plea for the jury to show Runyon "mercy," the prosecution stated:

> And I understand that [defense counsel] has asked you to give mercy to David Runyon. And I do think that it's important for you to ask yourselves what mercy he showed, not only Cory Voss, but his family and his children? . . . Cory Voss—we don't know what was said. But he was found in a defensive posture. It is likely he asked for mercy. He didn't get a chance to present any mitigating evidence. He didn't get a chance probably to talk about the effect of his crime on his family. There was probably an element of asking for mercy, pleading for his life. Did the defendant show him any mercy? You know, of course, that he did not.

According to Runyon, these comments rendered his sentencing proceeding unfair by appealing to the jury's emotions, thus precluding the kind of dispassionate decision that due process requires.

It is, of course, perfectly permissible for the prosecution to urge the jury not to show a capital defendant mercy, *see Higgs*, 353 F.3d at 331, which is what the prosecution did here. And as to the mention of Runyon's failure to show Voss any mercy, Runyon largely has his own lawyer to blame, for it was his lawyer who first told the jury that the prosecution "will probably stand up and say they are asking for mercy but Mr. Runyon didn't show Mr. Voss any mercy." In any event,

the whole matter represents the sort of thrust and parry in which attorneys typically engage in the course of their last chance to persuade a jury, and we see no error here.

4.

Runyon next argues that the prosecution improperly invited the jury to speculate about the mental "torture" that Voss might have endured during the period between the carjacking and his murder, taking issue with the following three comments, in particular:

- "You can see that the truck leaves the ATM at 11:36, and you can see that it comes back at about 11:44, some minutes later, and that is a seven- or eight-minute period of time, just the two men in the car. David Runyon has got a gun pointed at Cory Allen Voss. That time must have felt like an eternity to Cory Voss. And what could he have been thinking with a man sitting there pointing a gun at him? What kind of torture did that cause him to think about?"

- "What did David Runyon say to Cory Voss to get him to go around and make a second trip to that ATM machine? What fear must Cory Voss have felt when he was doing that? . . . We know that he must have done everything asked of him by David Runyon. He was trying to cooperate, to save himself, to get back to his family."

- "Certainly in that period that [Runyon] was in the truck with Cory Voss, Cory Voss was trying to comply and do whatever he could to get away, to get back to his family."

According to Runyon, because the prosecution introduced no evidence regarding Voss's state of mind, these comments

invited sheer speculation. And, he insists, because the prosecution never proposed the statutory aggravator for when "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner," 18 U.S.C. § 3592(c)(6), they were also completely irrelevant.

We disagree on both counts. Far from "speculating" about Voss's thoughts, the prosecution merely drew inferences from relevant evidence that was properly before the jury. For instance, the jury had heard testimony establishing the times at which Runyon entered Voss's car and Voss attempted withdrawals from the ATM. The medical examiner had also testified that Voss's body had been found in a "defensive posture." From this evidence, it was a short step to the conclusion that Voss had feared for his life and complied with Runyon's orders in hopes of saving it. We decline to fault the prosecution for what was, at most, a slight rhetorical flourish. Nor did the prosecution's comments prejudice Runyon, given their isolated nature and the overwhelming evidence supporting the aggravating factors found by the jury.

5.

Runyon challenges two final comments as inappropriate appeals to the jurors' emotions. First, the prosecution concluded its main summation with the following statement: "On behalf of the United States of America, in memory of Cory Voss, we ask that you do your duty and impose a sentence of death on the defendant for the murder of Cory Allen Voss." Second, the prosecution had earlier urged the jury to "send a message to the community, send a message with your verdict."

We agree with Runyon that the prosecution's exhortation to the jury to "do your duty" was improper. In *United States v. Young*, the Supreme Court condemned a prosecutor's almost-identical exhortation for the jury to "do its job" and find against the defendant. 470 U.S. 1, 18 (1985). We fail to see

why the prosecution should be able to circumvent this holding simply by substituting the word "duty" for "job." The government contends that it used the word "duty" here to refer to the jury's obligation to dispassionately weigh the aggravating and mitigating factors. That explanation is unpersuasive, given that the prosecution immediately followed the challenged statement by encouraging the jury to "impose a sentence of death."

We also decline to approve the prosecution's encouraging the jury to "send a message to the community, send a message with your verdict." In *United States v. Caro*, we expressed skepticism about "the government's comments about messages sent to anyone other than" the defendant, 597 F.3d 608, 625 n.17 (4th Cir. 2010)—skepticism that other circuits seem to share, *see, e.g.*, *Sinisterra v. United States*, 600 F.3d 900, 910 (8th Cir. 2010) (holding that urging "the jury to send a message with its verdict" is improper because it "impinge[s] upon the jury's duty to make an individualized determination that death is the appropriate punishment for the defendant"). To be sure, juries "express the conscience of the community on the ultimate question of life or death" when they decide whether to impose a death sentence. *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968). But that is different from the prosecution's comment here. Whereas reminding the jury that it "express[es] the conscience of the community" nevertheless maintains a proper focus on the defendant (since any "expression" is directed at the defendant alone), urging it to "send a message to the community" invites it to play to an audience beyond the defendant—to use its decision not simply to punish the defendant, but to serve some larger social objective or to seek some broader social approval as well. This latter perspective is at least in tension with the individualized assessment of the defendant's culpability that the Constitution requires.

We are confident, however, that neither comment rendered the proceeding unfair, for "the complained-of comments were

isolated, did not rise to the level of argument that might mis-
lead or inflame the jury concerning its duty or divert it from
its task and were made in the context of a case involving com-
pelling evidence of numerous aggravating factors." *Higgs*,
353 F.3d at 331; *see also Caro*, 597 F.3d at 625 n.17 (finding
that comments similar to those here, though perhaps
improper, did not warrant reversal because they were not suf-
ficiently prejudicial). Runyon singles out two improper state-
ments from a summation that spans nearly four dozen pages
in the record.

Throughout the summation, moreover, the prosecution
repeatedly and accurately explained to the jury how it should
weigh any aggravating factors it had established against any
mitigating factors established by the defense. The district
court reinforced these points in its jury instructions, admon-
ishing that "[t]he law does not permit you to be governed by
conjecture, surmise, speculation, prejudice, or public opinion"
and that "[p]assion, prejudice, and arbitrary considerations
can play no role in your efforts to reach a just result in this
case." And the court further warned that "statements and argu-
ments of counsel are not evidence in the case," as mentioned
above. Taken together, all these instructions minimized any
risk that the jury would render a decision based on the prose-
cution's two fleeting comments, as opposed to the over-
whelming evidence supporting all of the six statutory and
nonstatutory aggravators. Neither of the prosecution's ques-
tionable comments, then, "prejudicially affected" Runyon,
*Higgs*, 353 F.3d at 330—and his sentencing proceeding,
therefore, was not so infected "with unfairness as to make the
resulting [verdict] a denial of due process." *Donnelly*, 416
U.S. at 643.

## VI.

Runyon challenges a number of other aspects of his sen-
tencing proceeding on both constitutional and statutory
grounds. We consider each challenge in turn.

## A.

Runyon first takes issue with portions of the instructions that the district court delivered to the jury at various points during the proceeding. In particular, he challenges a number of passages typified by the following:

> In this phase, at the end of your deliberations all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror, is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

According to Runyon, these instructions were unconstitutional because they indicated that the jury could impose a death sentence so long as it concluded that the aggravating factors "sufficiently outweighed" the mitigating factors, when in fact it should have been instructed that it had to find that the former outweighed the latter "beyond a reasonable doubt."

Runyon's argument, however, is belied by the plain text of the FDPA. Under the statute, although the government bears "[t]he burden of establishing the existence of any aggravating factor . . . beyond a reasonable doubt," the jury must ultimately determine "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death" in order to recommend that punishment. 18 U.S.C. § 3593(c), (e). Contra Runyon, the FDPA does not require the jury to find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt, and the jury therefore need not be so instructed.

To be sure, the Supreme Court has held that the Sixth Amendment requires juries to find aggravating factors necessary for the imposition of the death penalty beyond a reasonable doubt, *see Ring v. Arizona*, 536 U.S. 584 (2002), but it has never extended this requirement to juries' weighing of aggravating and mitigating factors. The only appellate decision to make that leap is one by a panel of the Sixth Circuit that has since been vacated pending rehearing en banc. *See United States v. Gabrion*, 648 F.3d 307, 325-28 (6th Cir. 2011), *reh'g en banc granted, opinion vacated*, Nos. 02-1386/1461/1570, 2011 U.S. App. LEXIS 23290 (6th Cir. Nov. 17, 2011). In contrast to this outlier, at least four other circuits have held that the reasonable-doubt standard does not apply to the weighing of aggravating and mitigating factors, reasoning that that process constitutes not a factual determination, but a complex moral judgment. *See United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31-32 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007). We find this reasoning persuasive and accordingly join the broad consensus of authority.

Because the district court here recited the governing standard from the FDPA virtually verbatim, and because it also repeatedly reminded the jury to find only those aggravating factors that the prosecution had proved beyond a reasonable doubt, we conclude that its instructions were perfectly proper.[3]

## B.

At two points following the conclusion of the guilt phase, the district court excused a juror and replaced her with an

---

[3]Even were we to deem the instructions erroneous, any error would likely constitute invited error, as Runyon's own lawyer requested the very instructions that Runyon now challenges on appeal. *See United States v. Herrera*, 23 F.3d 74, 75-76 (4th Cir. 1994).

alternate. Runyon now challenges certain decisions by the district court related to these substitutions, but we find no error warranting reversal of his sentences.

1.

On July 21, 2009, four days after the guilt phase ended and one day before the eligibility phase began, the district court excused juror Robin Foreman, whose mother had died the previous night. It replaced her with one of the alternates, who had not been released. The district court informed the parties of the substitution the next day, just before the eligibility phase commenced.

Although Runyon did not object at the time, he now argues that the district court abused its discretion in dismissing Foreman, rather than simply postponing the half-day eligibility hearing until closer to the selection hearing, which did not begin until August 19, 2009, nearly a month later. We can readily dispose of this claim. Federal Rule of Criminal Procedure 24(c) expressly authorizes district courts to impanel alternate jurors and to substitute them for jurors who can no longer serve. This court, moreover, reviews such decisions for abuse of discretion, which is rarely found in this context. *See, e.g.*, *United States v. Nelson*, 102 F.3d 1344, 1349-50 (4th Cir. 1996) (finding no abuse of discretion where the district court replaced two jurors with alternates because the jurors were scheduled to go on vacation the next day); *United States v. Hayden*, 85 F.3d 153, 157 (4th Cir. 1996) (finding no abuse of discretion where the district court replaced a juror who knew one of the witnesses with an alternate, rather than declare a mistrial); *United States v. Colkley*, 899 F.2d 297, 303 (4th Cir. 1990) (finding no abuse of discretion where the district court excused a juror who failed to appear for thirty minutes and replaced him with an alternate). Here, before excusing Foreman, the district court confirmed that her mother had actually died. Given the uncertainty regarding when she might be able to return, as well as the inconvenience

that any delay might cause, we have no trouble concluding that the district court was well within its discretion in deciding to excuse and replace Foreman rather than postpone the proceedings.

Runyon also contends that the district court, in deciding to dismiss Foreman at an *in camera* proceeding from which both he and his lawyer were absent and of which they received no notice, violated his right to be present at certain critical stages of the proceedings against him, as guaranteed by both the Fifth Amendment's Due Process Clause and Federal Rule of Criminal Procedure 43. We agree that the district court erred in deciding to dismiss Foreman with neither Runyon nor his lawyer present. The Due Process Clause guarantees a defendant the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings," *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975), while Rule 43 enshrines an even broader right to be present, *see United States v. Rolle*, 204 F.3d 133, 136-37 (4th Cir. 2000). In *United States v. Camacho*, 955 F.2d 950, 952-53 (4th Cir. 1992), we held that both of these provisions required the defendant's presence at jury impanelment, a requirement we extended to the removal of jurors in *United States v. Hanno*, 21 F.3d 42, 46-47 (4th Cir. 1994). We thus hold that Runyon should have been present when the district court decided to excuse and replace Foreman.[4]

We next consider whether this error requires us to reverse Runyon's sentences. The parties vigorously dispute the appropriate prejudice standard, with Runyon urging us to apply harmless error and the government plain error. Although Run-

---

[4]Although we hold that Runyon should have been present when the district court decided to excuse Foreman, we do not agree with Runyon's claim that the proceeding needed to be public, for Runyon points us to no precedent extending the Sixth Amendment right to a public trial to such decisions. On the contrary, district courts often decide whether to replace jurors with alternates at *in camera* conferences. *See, e.g.*, *United States v. Boone*, 759 F.2d 345, 347 (4th Cir. 1985).

yon and his lawyer obviously never could have objected at the *in camera* proceeding, from which they were absent, they also failed to object at the beginning of the eligibility hearing, when the district court announced Foreman's dismissal. Because Runyon thus had "an opportunity to object" to the district court's ruling but failed to do so, we apply *Olano*'s plain error standard. Fed. R. Crim. P. 51; *see* Fed. R. Crim. P. 52(b).

We find that Runyon has failed to show that the district court's error satisfies the third prong of *Olano*—to wit, that the error affected Runyon's "substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993). The district court replaced Foreman with an alternate who had been selected along with all the other jurors and alternates during voir dire, at which both Runyon and his lawyer were present. Moreover, the court replaced her during a hiatus in the proceedings— after the jury had found Runyon guilty but before it had even begun to hear evidence as to what sentence he should receive. *See United States v. Evans*, 352 F.3d 65, 70 (2d Cir. 2003) (finding no prejudice from a Rule 43 violation where the juror was replaced "well before the case was sent to the jury"). Had there been any risk of prejudice from the substitution, one would have expected Runyon's lawyer to have vigorously objected and to have asked for a continuance to await Foreman's return when the district court announced its decision, yet he did neither. It would set a poor precedent to allow a party to remain silent when a substitution is announced, await the verdict, and lodge an objection only when the jury's determination was adverse. In common parlance, such a tactic is called sandbagging. For this reason among others, Runyon's presence claim fails not only under *Olano*'s third prong, but its fourth prong as well, as our refusal to reverse does not result in any "miscarriage of justice." 507 U.S. at 736.[5]

---

[5]Even were we to apply harmless error, we believe that the government has "prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24.

2.

The district court replaced a second juror on August 27, 2009. Specifically, on August 26, the penalty selection phase ended, and the jury deliberated for just under an hour and a half before recessing for the evening. The next morning, the court learned that the brother-in-law of juror Carol Kocevar had passed away in Delaware the night before. Kocevar asked to be excused so that she could travel to Delaware. After holding a hearing in open court (but without the other jurors present), and with the agreement of both the prosecution and Runyon, the district court excused Kocevar and replaced her with the next alternate.

On appeal, Runyon contests not the district court's decision to excuse Kocevar, but rather its instruction to the jury after she was replaced by the alternate. That instruction stated:

> I would tell you that what you need to do is, now it is the 12 of you, and if you would review for [the second alternate juror]—you were out only a little over an hour yesterday, and, [Jury Foreperson], as foreperson, if you would just see that you review with her what was discussed and key her in, and then proceed with your deliberations.

According to Runyon, by telling the jury merely to "review" the previous day's deliberations with the alternate and then "proceed with your deliberations," the district court violated Federal Rule of Criminal Procedure 24(c)(3), which provides in relevant part: "If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Because Runyon failed to object to the instruction at the time, we review it for plain error. *Olano*, 507 U.S. at 732.

Assuming for the sake of argument that the distinction Runyon seeks to draw is more than semantic, he again cannot

show that any error affected his "substantial rights." *Id.* Instructions should not be prone to quibbles. *See Henderson v. Kibbe*, 431 U.S. 145, 152-54 & n.10 (1977). "While a careful picking apart of the instructions' wording [may often] reveal minor ambiguity, when read in [their] entirety," it may become apparent that "the instructions were clear and did not permit" an improper verdict. *United States v. Moran*, 493 F.3d 1002, 1010 (9th Cir. 2007) (per curiam). Here, while the district court did not repeat the words of the Rule verbatim, the court in substance instructed the jury to rewind its proceedings for the benefit of the alternate before proceeding further. This, in essence, is what the Rule requires.

Moreover, Kocevar participated in the deliberations for under an hour and a half—the time the jury deliberated on August 26, the first day of deliberations. After she was replaced, on the morning of August 27, the jury continued to deliberate for the better part of a day—specifically, until six that evening, when it informed the court that it had reached a verdict. Given that the alternate had heard the very same evidence as all the other jurors and was absent for no more than one and a half hours of deliberations that lasted at least eight, we fail to see how the district court's instructing the jury to "begin its deliberations anew" would have made any difference to the course of the deliberations and thus to the ultimate outcome.

According to Runyon, this quantitative analysis misses the qualitative significance of Kocevar's replacement. Specifically, he notes that the district court had originally instructed the jury to begin its deliberations by voting on the four proposed nonstatutory aggravating factors and only then to proceed to weighing any aggravators against any mitigators. It is thus possible, Runyon argues, that, absent the instruction required by Rule 24(c)(3), the alternate who replaced Kocevar ended up voting to sentence Runyon to death based on nonstatutory aggravating factors that had been found by the other jurors before Kocevar was excused. We cannot reverse a

jury's verdict, however, based on such a "speculative asser-tion of prejudice." *United States v. Evans*, 635 F.2d 1124, 1128 (4th Cir. 1980) (refusing to overturn a conviction where the district court failed to instruct the jury to begin its deliber-ations anew after replacing one juror with an alternate). We cannot possibly know just where the jury was in its delibera-tions when Kocevar was replaced. Moreover, like all the other jurors and alternates, the alternate who replaced Kocevar had been repeatedly instructed by the district court that any non-statutory aggravating factor had to be found unanimously, beyond a reasonable doubt. We have no reason to suspect, let alone presume, that the jury failed to follow these instruc-tions.

Finally, as already noted, this was simply not a close case: the evidence on each aggravator was overwhelming, and the relative weight assigned by the jurors to the aggravators and mitigators hardly shows their judgment to have been in any way unreasonable. It should thus have come as no surprise that, when polled, each juror, including the one who replaced Kocevar, affirmed the verdict. Once again, to reverse under *Olano* on the basis of what was at most an infelicitous expres-sion would encourage counsel to sit strategically silent during trial and to forage for error thereafter.

## C.

Finally, Runyon asserts that the totality of the errors he has alleged rendered his entire sentencing hearing fundamentally flawed and that his sentences must therefore be reversed under both the constitutional "cumulative error" doctrine and the FDPA, which requires us to determine "whether the sen-tence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," 18 U.S.C. § 3595(c)(1).

"Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the

potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009). "To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* "Generally, however, if a court 'determine[s] . . . that none of [a defendant's] claims warrant reversal individually,' it will 'decline to employ the unusual remedy of reversing for cumulative error.'" *Id.* (alterations in original) (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)). The harmless errors in this case do not justify that "unusual remedy." On the contrary,

> although we recognized (and assumed) a few harmless errors, they were not widespread or prejudicial enough to have fatally infected [the defendant's] trial or sentencing hearing. The proceeding below adhered to fundamental fairness. There is overwhelming evidence of guilt in the record and any possible error did not play a role in the outcome of either phase of [the] trial. Moreover, each aggravating factor (both statutory and non-statutory) determined by the jury was well supported by the record. Finally, we cannot see how cumulative error could have caused the jury to weigh the relevant sentencing factors any differently.

*United States v. Lighty*, 616 F.3d 321, 371 (4th Cir. 2010); *see also United States v. Caro*, 597 F.3d 608, 635-36 (4th Cir. 2010).

"It is well-settled that a criminal defendant is entitled to a fair trial not a perfect one." *Lighty*, 616 F.3d at 336 (citing *United States v. Hasting*, 461 U.S. 499, 508-09 (1983)). Indeed, it is the rare trial that will be an ideal specimen in all respects, given that even the most well-intentioned trial participants may commit the occasional error. Though imperfect in some minor respects, Runyon's sentencing hearing was thoroughly fair. Tellingly, none of his claims concern his

basic ability to present his case to the jury in an effective manner. He does not contend that he was denied the opportunity to confront the prosecution's witnesses or rebut its other evidence. Nor does he argue that he was in any way hamstrung in his ability to call witnesses of his own or introduce mitigating evidence. Such a claim would be simply incredible, given the scope, length, and magnitude of the defense's mitigation case. Runyon's claim that the jury's verdict was impermissibly biased is belied by the fact that the very same jury unanimously found nine mitigators in his favor. Though Runyon's claims deserve—and have received—our careful attention, he seeks in essence to present his case unfettered while substantially shutting down his adversary's. That is not a fair proceeding, but a one-sided one.[6]

In short, the basic problem with Runyon's cumulative error claim is that it runs up against the cumulative weight of all the evidence against him. There is simply no question that Runyon fired five bullets into the body of an innocent naval officer and young father—at close range and in cold blood. There

------

[6]At oral argument, questions arose with regard to the government's selection of defendants for capital punishment. In this case, the prosecution exercised its discretion on the basis of a number of distinctions between Runyon and the other defendants—including that Runyon was the actual triggerman in the murder-for-hire scheme; that he accepted payment for killing someone who was essentially a complete stranger; and that he not only never cooperated with the investigation but sought to thwart it at virtually every turn.

This does not mean, of course, that the prosecution's discretion cannot be questioned in any way. Here, that discretion was challenged quite vigorously, in fact, by the defense's emphasis on the equally-culpable mitigator, on which the jury found in Runyon's favor. For this court, however, to overturn Runyon's sentences in the absence of evidence that the prosecution exercised its discretion on some impermissible basis (such as race, ethnicity, or religion) would exceed our authority. *See United States v. Passaro*, 577 F.3d 207, 219 (4th Cir. 2009) (holding that where the defendant "fail[ed] to cite *any* evidence that in prosecuting him . . . the Government unlawfully or discriminatorily exercised its prosecutorial discretion," there existed "no basis for judicial interference with that discretion").

is simply no question that the jury had a strong evidentiary basis for unanimously finding numerous aggravating factors beyond a reasonable doubt—including that Runyon acted with monetary motives, planned and premeditated the murder, exploited his military and law enforcement experience in committing it, and showed not a hint of remorse for inflicting inestimable human damage for a paltry sum. The jury was justified in concluding that these aggravators sufficiently outweighed the mitigators established by the defense, and Runyon has given us no reason to upset the judgment. For the same reasons, we also reject Runyon's contention that "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595(c)(1).[7] His convictions and sentences thus stand affirmed.

*AFFIRMED*


NIEMEYER, Circuit Judge, concurring:

I join in Judge Wilkinson's fine opinion and judgment on appeal, reserving only my conclusion that the district court did not err in admitting the videotape recording into evidence during the penalty selection phase of the trial.

The videotape was a recording of a voluntary interview given by Runyon after being fully advised of his *Miranda* rights. There is no evidence that Runyon's will was overborne or that he provided the statement in response to any trick or misrepresentation. Moreover, the statement was relevant, as Judge Wilkinson has pointed out in more detail, to the aggra-

---

[7]Runyon also argues that the death penalty now violates the Eighth Amendment, in light of "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). But we rejected an identical claim just recently, *see Lighty*, 615 F.3d at 370, and to do otherwise here would run afoul of the Supreme Court.

vating factor that Runyon lacked remorse for his conduct and to the mitigating factor that other equally culpable defendants would not receive the death penalty.

While Runyon contends that his interrogators inappropriately played race and religion during the course of the interrogation, a review of the recording does not reveal any unconstitutional intent, purpose, or effect. The interrogators invoked racially-generalized traits of courage and pride, as well as religious values of repentance and forgiveness, to encourage Runyon to tell the truth about what occurred. These references to race and religion were not inflammatory, unless any reference to race, ethnicity, and religion is considered inflammatory, a view that I do not hold, but were appeals to Runyon's moral sense, albeit unsuccessful. Surely, if the interrogators had called Runyon a mouse or a wimp or suggested that he was not a whole man until he spoke the truth, he would have made no complaint.

At bottom, I would conclude that the interview was voluntarily given, was relevant, and accurately revealed Runyon's total lack of remorse and moral responsibility.

To be especially cautious, the district court nonetheless instructed the jury that the tape was offered *only* "for the limited purposes of demonstration of remorse in regard to the alleged nonstatutory aggravating factor to this effect, and for relevant culpability in regard to the alleged statutory mitigation factor to this effect." The district judge also admonished the jury that no statement made by the detectives during the interrogation was to be taken as evidence in the case. Finally, the court instructed the jury repeatedly that in considering the death sentence for Runyon, it was not to "consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim in this case. These facts are completely irrelevant to the important issues you must consider at this phase of the proceedings." Indeed each juror was required to sign a

certificate affirming his or her compliance with the instruction.

In these circumstances, I believe that the district court did not err in admitting the videotape into evidence at this phase of the trial. I also concur fully in Judge Wilkinson's analysis and conclusion that any error in admitting the videotape was harmless beyond a reasonable doubt.

I am pleased to join his well-crafted and thorough analysis of the issues presented in this appeal, and I am pleased to concur.